H. T. MOORE v. CITY OF DULUTH and Others.

October 31, 1898.

Nos. 11,359—(232).

City of Duluth—Issue of Bonds for Water Plant—Authority Revoked—Election under Laws 1897, c. 218.

   *Held*, under the conceded facts, that the power and authority of the common council of the city of Duluth granted by the voters in 1895, in the manner prescribed by the charter, to issue and sell bonds for the purpose of raising funds with which to construct a new and independent water plant, was extinguished and revoked, as to any further issue, after a portion of the bonds had been issued and disposed of, by the result of

an election held under the provisions of Laws 1897, c. 218, at which it was voted to issue bonds for the purchase of the water and light plant built and in operation when the bonds first mentioned were authorized.

Action in the district court for St. Louis county to restrain the common council and other officials of the city of Duluth from issuing the bonds of the city for the purpose of obtaining money with which to extend the waterworks of the city. From an order, Ensign, J., overruling plaintiff's demurrer to the answer, he appealed. Reversed.

*L. C. Harris,* for appellant.

*J. B. Richards* and *S. T. & Wm. Harrison,* for respondents.

COLLINS, J.

For some years prior to 1895 the main portion of the city of Duluth had been supplied with water by the Duluth Gas & Water Company. In September of that year, and under charter provisions, the following propositions were submitted to the voters of said city, viz.:

(1) Shall bonds to the extent of $1,856,000 be issued to construct an independent water plant in said city?

(2) Shall bonds to the extent of $1,856,000 be issued to purchase a water plant already in existence in said city of Duluth?

(3) In the event the voters shall declare in favor of purchasing a water plant already in existence in said city of Duluth, shall additional water and light bonds, to the extent of $850,000, be issued for the purpose of extending and improving said plant?

At the ensuing election the voters declared in favor of the first of said propositions, and against the second and third.

In the early part of the year 1896 the common council of said city duly passed an ordinance authorizing the issue of $1,106,000 of the $1,856,000 of the bonds voted for by the voters of said city at the said election held in September, 1895. With the proceeds derived from the sale of said $1,106,000 of bonds, the said city erected a pump house and pumping station on Lake Superior, eight miles further down the north shore of said lake than the point where the pump house of the said Duluth Gas & Water Company was located, and proceeded to and did construct water mains from its

said pumping station to a point near the inhabited portion of said city of Duluth, and to a point where the said water mains so constructed by said city could be connected with the water plant of the said Duluth Gas & Water Company.

After the construction of the pumping station and water mains built with the $1,106,000 of bonds heretofore referred to, and in the month of January, 1898, the voters of said city of Duluth voted, under and by virtue of Laws 1897, c. 218, to issue $1,250,000 of bonds for the purpose of purchasing the combined water and light plant owned by the Duluth Gas & Water Company. With the proceeds derived from the sale of said bonds the said city of Duluth purchased the plant of the said company, and ever since August 1, 1898, has been the owner and operator of said plant. The present bonded indebtedness for the purposes named is therefore $2,356,000.

Some time in the month of August, 1898, and after the said city had acquired possession of the plant of the said Duluth Gas & Water Company, the common council of said city of Duluth took steps to issue and sell $300,000 more of the $1,856,000 of bonds authorized by virtue of the election held in September, 1895, for the purpose of placing water mains in certain portions of the inhabited parts of said city that were not furnished with water and never have been. The plaintiff, as a taxpayer in said city, instituted this proceeding to restrain the issue and sale of the bonds last mentioned. The facts above stated having fully appeared in the answer, plaintiff's counsel interposed a general demurrer, and this appeal is from an order overruling such demurrer.

The position of appellant's counsel is that when, at the 1898 election, it was voted to issue bonds for the purpose of purchasing the then existing plant owned by the gas and water company,—a plan or purpose which had been repudiated and rejected at the 1895 election,—the right of the council to make any further issue of bonds for construction, authorized at the election last mentioned, ceased and terminated.

It must be conceded, of course, that the city council has no powers except such as are expressly conferred upon its members by law, and such as are incidental or necessary to carry out these expressly conferred powers; and also that, in respect to a disposition

of the proceeds obtained from a sale of bonds issued for either constructing a new water plant or for purchasing one already built, the council was and is merely an agency or instrumentality to carry out the wishes and intentions of the voters as the same have been manifested in these two elections.

The result in 1895, when three propositions were submitted to the electors,—one to issue bonds in the sum of $1,856,000, for the construction of a new plant, which was carried; one to issue bonds in the same amount, for the purpose of purchasing the plant already in operation and owned by the gas and water company, which was voted down; and, in case the second carried, a third, for the issuance of bonds in the sum of $850,000, for the purpose of extending and improving the plant therein mentioned (the extension and improvement now contemplated), which was also voted down,— indicated very conclusively that at the time of this particular election the voters were opposed to acquiring the old plant, and also opposed to its extension or improvement, and also that they proposed and intended to restrict and limit the cost of a new plant to the amount of the bonds voted ($1,856,000). The expenditure of a greater sum than this in the construction of a new plant was prohibited, by implication at least. When bonds to the amount of $1,106,000 had been issued and disposed of, and the proceeds had been used in the new construction, so that it was where it could easily be connected with the existing plant, and the latter could well be utilized, the question of its purchase, once rejected, was again submitted to the electors, and their approval secured to the proposition that the purchase be made with the proceeds of another issue of bonds in the sum of $1,250,000. The bonds were sold and the purchase made; and when this was done the indebtedness of the city on account of original construction and subsequent acquisition of the old plant amounted to the sum of $2,356,000, or more than had been voted for in 1895 by $500,000.

Now, what were the wishes and intentions of the voters when the 1898 election was held? They certainly did not expect that the council would parallel the water mains already in place and in use, which were authorized to be acquired, or that any money would be expended in duplicating the old plant, in whole or in part. The

plain purpose of the voters in 1898 was, at least, to modify the authority previously granted as to a part of the contemplated new construction. The authority theretofore given to issue bonds, that a new plant might be built in that part of the city covered by the old, was absolutely revoked at the 1898 election. This seems to be indisputable.

But the contention of plaintiff's counsel is that steps taken, and an election had, under the statute of 1897, could operate to extinguish all authority theretofore given the council to proceed in accordance with the charter; and that taking into consideration what had previously transpired, and the exact situation when the 1898 election was held, it is evident that it was supposed by the voters that an approval of the proposition to purchase, at the polls, would be a revocation of all authority, and would terminate the right of the council to proceed· further in the way of issuing bonds for construction anywhere in the. city; and, further, that the result of the 1898 election did have this precise effect.

The prior events and present circumstances mentioned and relied on by counsel seem to be the facts that the voters had, in 1895, refused to purchase the old plant; had objected to its extension into the territory now sought to be covered; had limited the cost of the new plant to $1,856,000; had witnessed the expenditure of $1,106,000 of this amount, with nothing more accomplished than a practical connection with the old plant, which covered that part of the city most deserving and most desirous of a new water supply; had but $850,000 left with which to complete the new plant, a sum manifestly inadequate for the purpose; the authorities had submitted, for approval or disapproval, a proposition to buy the old plant for $1,250,000, an amount no greater than would be required to duplicate it, we may safely assume, and, if this proposition was accepted by the voters, there would then be issued bonds for waterworks exceeding, by $500,000, the amount originally settled upon and fixed as sufficient.

We are of the opinion, taking all of these facts into consideration, that it was the intention and understanding of those who favored the purchase of the old plant that, when the scheme was approved, the bonds issued, and the purchase made, the authority of the coun-

cil was at an end, and that it could not proceed with the issuance of the balance ($750,000) of the amount originally authorized, for any purpose whatsoever, thus increasing the bonded indebtedness for this particular purpose to $3,106,000. The view of this matter taken by the ordinary voter would be that with the purchase of the already operated plant, and its connection with the new one, the expenditures were at an end, just as he would have looked at a proposition to purchase submitted soon after the vote in favor of construction, and before any work had been done in the way of the building of a new and independent plant.

It must be borne in mind that the question before us is not whether the proposed extension is beneficial or necessary, but it is whether the city council has the power to issue and sell these bonds.

Order reversed.

BUCK, J.

I dissent.